IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ROBBIE MARTIN | § | |
| *plaintiff* | § | |
| | § | CA No. _____ |
| EXXONMOBIL OIL CORPORATION | § | |
| d/b/a EXXONMOBIL | § | |
| *defendants* | § | JURY TRIAL DEMANDED |

## PLAINTIFF'S ORIGINAL COMPLAINT

Comes now Plaintiff Robbie Martin ("Plaintiff" hereinafter or "Ms. Martin") and files

this her Original Petition complaining of ExxonMobil Corporation and for cause therefore would

show the Court as follows:

### I. PARTIES

1.    Plaintiff Robbie Martin is an individual residing in Harris County, Houston, Texas.

2.    Defendant ExxonMobil is a foreign for-profit entity, with its corporate headquarters in

Harris County, Houston, Texas.  Defendant ExxonMobil may be served by and through its

counsel of record, Ms. Latasha McDade, Supervising Counsel, ExxonMobil Corporation

Law Department, 22777 Springwoods Village Parkway N1.4A.528, Spring, Texas 77389.

3.    The Defendant may be designated by one of the following entities registered with the

Texas Secretary of State: **(i)** ExxonMobil Oil Corporation; **(ii)** ExxonMobil Upstream

Research Company; **and/or (iii)** exxonMobil Research And Engineering Company.

Defendant ExxonMobil has multiple subsidiaries and affiliated branches, all of which are

served by it's Registered Agent, Prentice Hall Corp. System, d/b/a Corporation Service

Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701-3218, USA.

4.  To the extent that the above named Defendant is conducting business pursuant to a trade name or assumed name, then suit is hereby brought against them pursuant to the terms and provisions of Rule 28 of the Texas Rules of Civil Procedure, and Plaintiff hereby demands that upon answering suit, that Defendant answer in their correct legal name and assumed name.

## II. JURISDICTION & VENUE

5.  This Court has Jurisdiction over the claim because the Plaintiff has asserted a claim arising under Federal Law; specifically 42. U.S.C. §1981, and 28 U.S.C. §§1343, 1331. Jurisdiction is also proper as a matter of diversity as the amount in controversy exceeds $75,000.00 USD.

6.  Venue is proper under this District because the Plaintiff resides in this district, and it is the District of Residency of a Corporation in a state with multiple districts, pursuant to 28 U.S.C. §§1391 (b)(2) & (d). Defendants also reside within the same district as the Plaintiff.

## III. EXHAUSTION OF ADMINISTRATIVE REMEDY

8.  Pursuant to the language of 42 U.S.C. § 1981 *et seq*, there is no administrative filing requirement with any agency under the purview of the United States government, hence no requirement to be met prior to bringing a claim, under this statute, in a court of competent jurisdiction.

9.  Pursuant to 28 U.S.C. § 1658(a), there is a four (4) year statute of limitations on any claim brought under 42 U.S.C. § 1981. As the incident made the crux of this case occurred on or about August, 2020, Plaintiff affirms that cause is brought within the statute of limitations.

10.   Plaintiff's cause of action is timely filed in compliance with the deadline created pursuant to her Statutory Notice of Right to Sue, issued on or about 1/7/2021, under charge No. 460-2021-0001. Ninety days beyond is calendared at April 7th, 2021. Hence Plaintiff's cause of action is timely filed.

### IV. FACTUAL ALLEGATIONS

11.   Ms. Martin identifies as Hispanic / is of Latin origin, is a female, and is over the age of forty (40).  Under these three class characteristics, Ms. Martin is qualified under the auspices of Chapter 21 of the Texas Labor Code (TCHRA), Title VII of the Civil Rights Act of 1964, and 42 U.S.C. §1981.

12.   It has been brought to the attention of the Plaintiff that there has been an overwhelming amount of 'layoffs' within ExxonMobil, the majority of which constitute Caucasian, Hispanic, and Asian employees.[1]  Moreover, these terminations have been increasingly couched as "performance based" as ExxonMobil has shifted it's paradigm from 3% to *over* 8% basis of "Needs Serious Improvement" – a metric qualifier which may result in immediate summary termination.[2]   However, given that th e Plaintiff works within ExxonMobil's Human Resources division, she is aware that it is closer to 10%.

13.   Moreover, it has been brought to the Plaintiff's attention that a number of Exxon employees within the above protected class(es) have been given the option to 'resign or be terminated'. This "choice" has been set before them in the shadow of a Performance Improvement Plan

---

[1] https://www.thelayoff.com/t/15Uol3nC

[2] https://www.forbes.com/sites/elanagross/2020/07/24/exxonmobil-reportedly-changed-its-employee-review-process-to-increase-performance-related-job-cuts/#1f19121e5942 ; **see also** https://techstaffer.blog/2020/08/03/exxonmobil-uses-performance-reviews-to-justify-job-cuts/

which is – in the words of (former) ExxonMobil managers – 'untenable and designed to wash out the employee.'[3] It should be noted that the caveat exists whereby *if* an Exxon employee accepts this agreement, they contractually forfeit their right to work for ExxonMobil, or any of its associated, affiliate, or subsidiary entities ever again.

14.     *After* submitting her complaints of racial discrimination on or about 8/14/2020, the Plaintiff was immediately tasked with an impossible Performance Improvement Plan; one suggesting the completion of approximately one (1) years worth of work within the next two to three (2-3) months.  Again, a number of ExxonMobil employees have been tasked with a *Sisyphean* PIP which is designed to wring them from continued employment with ExxonMobil.

15.     More distressing, among a number of employees, the Plaintiff was not privileged to the contents of the PIP until she forced the issue – at length – multiple times.  And upon information and belief, the terms and conditions of that Improvement Plan were only given verbally after her volume of requests.  To be clear, it is alleged that the employee was not allowed to know the terms and conditions of the Performance Improvement Plan until *after* she agreed to execute it and abide by its terms in exchange for an brief reprieve from termination, followed by excommunication from working for the Defendant ever again. It is further alleged that this same tack and tactic was used with the balance of the forced 'resignations' referenced in the above paragraphs.

16.     Plaintiff's co-worker, an African American female, is noted as her comparator.  Upon information and belief, this employee has not been burdened with a decision to resign or undergo an untenable Performance Improvement Plan, despite their identical positions within

_____

[3] Paraphrased

Exxon, and that employee's alleged sub-par performance.

17.   The Plaintiff has been shocked by this ultimatum set before her, as she has had zero prior coaching, warning (verbal or written), or instruction that she had experienced or comported any errors in performance within her last calendar year of employment with ExxonMobil. Case in point, the Plaintiff qualified for a performance-based bonus within her last several months of employment. Yet somehow, with the last 2 months of her employment, her performance has gone from a ranking of "B" to a ranking of "D", with little to no explanation. To be clear, she has never been instructed regarding the metrics pointing to performance concerns until the issuance of her latest performance review, given less than two (2) weeks prior to her complaints of discrimination.

18.   On or about 5/1/2013, Ms. Martin was hired into ExxonMobil as a Group Administrator in the Civil and Marine Engineering Floating Structures for ExxonMobil Development company under Amy Stysligner.  During that time, Ms. Martin served in multiple capacities and accomplished a measure of tasks and objectives which can easily be found in her CV.

19.   During this period of employment, Ms. Martin always received consistent positive feedback for her ability to adapt to change and meet the needs of her team that eventually grew to as many as seventy (70) staff members.  More importantly , she maintained a "B" ranking commensurate with her performance, skill sets, abilities, and work ethic / attitude.  That ranking would be held until ExxonMobil's response to the COVID -19 pandemic.

20.   On or about 5/1/2014, there was a change in management within Ms. Martin's department at Exxon. Ms. Martin remained in the Floating Structures group under Sathish Balasubramanian as interim manager until Scott Papka became the full time manager. Along

with a volume of other accomplishments and achieved goals, Ms. Martin was *again* able to

maintain her "B" ranking.

21.     In early January of 2019, Ms. Martin was promoted into the position of "Technician" within

Exxon Mobile Research Company, with no oversight and zero training. She would hold this

position until April 2019, at which point she was then tasked with the data entry for the 2019

reorganization.

22.     It should be noted that Ms. Martin's promotion from one of Administrative Assistance /

Office Manager, to the position of Technician, was solely based on her performance.  And

her retention of that position was, again, based on her performance in that role, and her

ability to consistently adapt, innovate, and perform to expectations.

23.     It should also be noted that Ms. Martin's entrance into the position of Technician was not

heralded by any formal training or qualifiers, and no formal mentoring or set range of metric

or goal accomplishments.  She was trained by her peers, and ultimately performed by and

through her own ability to adapt, learn, and innovate.

24.     The successful completion of coordination of the January reorganization and it's data entry

requirements garnered Ms. Martin's promotion into ExxonMobil Human Resources and the

position of Technician in Exxon Mobil Global Projects Staffing and Development for HR.

25.     On or about April 1st, 2019, Ms. Martin was informed that she was now a Technician in the

Global Projects Staffing and Development for ExxonMobil Human Resources.  She was

never formally trained or coached for this position.

26.    Ms. Kristy Absher was the manager that Ms. Martin was to report to in this role.

However, when Ms. Martin would ask Ms. Absher for job role responsibilities and duties,

Ms. Absher had a hard time providing anything because the position "was quickly evolving

and changing", as Ms. Absher put it. Despite this hindrance, Ms. Martin had been able to

succeed in all respects. She held that position until her separation from employment. And,

*again*, despite having zero formal training, coaching, or experienced oversight, in September

of 2019, she qualified for her raise and CL increase, as listed in her CV.

27.    To be clear, Ms. Martin was told she would have a position, in 2016, commensurate with her

skill sets and training. Namely, Ms. Martin was primed for a position as a Technician in

ExxonMobil's Research Company, based on her abilities.  In 2019, she was transferred to

Exxon's Research and Engineering Human Resources group for three (3) months where she

received *zero* training and no oversight regarding her duties or responsibilities. She was

tasked with the Reorganization/Move to the new campus, and found herself in the position

she holds at the present date.  Again, without training or oversight – yet maintaining an above

average ranking and qualifying for a raise and increase in classification.

28.    On or about February 2nd, 2020, Ms. Martin scheduled a meeting with Ms. Absher to discuss

performance concerns  Ms. Martin was experiencing with her counter-part and colleague

holding the same position.  Ms. Absher refused to engage or facilitate any resolution to the

matter, and the issues remain un-addressed to the present.

29.   Ms. Martin has had weekly meetings with Ms. Absher since January 1st of 2020 until the approximately July 27th, 2020, and at no point in time had Ms. Absher given Ms. Martin *any* feedback that her performance was sub par or in need of improvement in that span of time.

30.   On or about April 22nd, 2020, Ms. Martin had her initial PDS interview with Ms. Absher. While metrics were discussed, nothing was relayed to Ms. Martin indicating that her performance was at issue, or that her job was in jeopardy.

31.   On or about July 7th, 2020, Ms. Martin – along with several other Technicians – was included in "Improve The Base" teleconference with her manager(s).  The crux of this call was to inform these technicians that their positions would be moved to Argentina, ostensibly, for "cost savings purposes".  Ms. Martin was informed that over several months she would be tasked with cross training her replacement, along with her colleague and comparator.  To date, the Plaintiff is uncertain how she, or her co-worker, were qualified to train anyone.

32.   Finally, on or about July 27th, 2020, Ms. Martin's performance mysteriously and suddenly began to become sub par.  On that date, Ms. Martin had a Performance Assessment with Ms. Absher, wherein Ms. Martin was informed that her work product relative to her peers was Below Expectations, and her rank was now dropped from a "B" to a "D" without reason, substantiation, or explanation.  Yet still, she was to train her Argentinian replacement.

33.   It was at this point that Ms. Martin was given the ultimatum to sign and agree to a PIP (the contents of which were not explained to her for weeks afterward), or receive severance in lieu of two (2) months salary and resign - never to work for ExxonMobil again.

34.     At that time, Ms. Absher specifically informed Ms. Martin that she would **not** be providing her with a copy of the proposed Performance Improvement Plan or its requirements, and that Ms. Martin would simply have to execute the PIP agreement in order to see it's contents.

35.     It should be noted that upon investigating other publicized instances of ExxonMobil employees given the option to undergo a PIP or resign, the stipulation to never again work for an ExxonMobil entity, affiliate, or subsidiary was included in an overwhelming majority of the resignation offers.[4]

36.     In order to retain her continued employment, Ms. Martin would have to execute a Performance Improvement Plan – constituting an amendment to her employment agreement – without the opportunity to even read the contents of the plan, consult with a manager, or review the plan with her own legal counsel.

37.     On or about July 29th, 2020, Ms. Martin submitted a written request to Ms. Priya Luedtke and Ms. Absher, requesting a copy of the Performance Assessment Plan with feedback from their conversations on or about 4/22/2020 and details regarding her demotion to a "D" rank on or about 7/27/2020.  She received a copy of the July assessment only.  Leaving a gap of several months unaccounted for.

38.     It is Ms. Martin's contention that she was improperly targeted for termination, based on her race and ethnicity.  Her performance was acceptable until Exxon began to flounder due to the impact upon the economy due to turmoil within the Oil & Gas industry as well as COVID-19.  Then, after "cost-saving" efforts to transfer work to Argentina were initiated,

---

[4]https://www.glassdoor.com/index.htm

her performance suddenly began to suffer.  After Ms. Martin had already qualified for a raise and CL increase with zero training or qualified oversight.

39.    It is Ms. Martin's contention that ExxonMobil cannot defend her termination, or the ultimatum given thereof, with a legitimate non-discriminatory explanation when her counter-part / co-worker was not made to suffer the same choice.  In summary, Ms. Martin's similarly situated African American counter part, who is approximately 34 years of age, and *not* Hispanic, who did *not* qualify for a bonus, was *not* subject to the same or similar discrimination and retaliation as Ms. Martin was. Further, she was *not* placed on a PIP, but rather has been laterally promoted to the  Medical Occupational Health department.

40.    On or about 8/19/2020, in direct response to her concerns of discrimination, Ms. Martin was arbitrarily placed on a Performance Improvement Plan, despite her complaints as detailed above.  This PIP was issued erroneously, and was referenced as a default-action by Exxon's Counsel, despite the fact that no such language forcing the issuance of the PIP exists within Ms. Martin's proposed Waiver & Release / Performance Improvement Plan agreements supplied by ExxonMobil.

41.    On or about 1/7/2021, ExxonMobil was made aware that the Plaintiff was authorized by the Equal Employment Opportunity Comission - under charge No.  460-2021-0001 - to bring forth this charge of action pursuant to a statutory notice of right to sue letter.

42.    Ms. Martin was erroneously downgraded in her performance metrics, arbitrarily, and forced to engage in a performance improvement plan in *direct* response to her complaints and concerns regarding discrimination.  In other words, she was placed on the PIP as an act of

*retaliation* - and the fact that it was forced upon her *after* her complaint to ExxonMobil *via* demand letter from her counsel of record, crystalizes that.

43.     Further, it can de discerned that ExxonMobil, and Ms. Martin's immediate manager, Ms. Absher, were disingenuous and deceitful in placing Ms. Martin on the erroneous PIP, and the management thereof.

44.     Case in point, Ms. Absher *withheld* Ms. Martin's weekly performance feedback and metrics for the entire month of September 2020, despite Ms. Martin's multiple requests for same – issuing three (3) weeks of feedback in one email, and issuing a spurious mid-PIP review indicating that Ms. Martin should be terminated.  Withholding weekly performance reviews from an employee on a Performance Improvement Plan is unacceptable, and *shall* bear further investigation.

45.     Moreover, once Ms. Martin was placed on the PIP, the balance of Ms. Martin's access to digital databases (CareerConnect) was removed by Ms. Absher –  fundamentally crippling Ms. Martin's ability to achieve *any* of the necessary PIP objectives and requirements to remain employed, essentially setting Ms. Martin up to fail.

46.     To compound the hostile work environment and harassment, Ms. Martin's access to the Local Area Network was also removed, making her work that much more difficult, time consuming, and onerous.  Ms. Martin's colleagues were aware that she did not have internet access while still employed, as she was forced to reach out to them for assistance in completing some of her tasks.  This caused Ms. Martin to be embarrassed and humiliated in her work place.

47.     In mid October of 2020, after receiving three (3) weeks of write-ups in one email, despite meeting all expected performance metrics and requirements, Ms. Martin required mental health leave, which was entered into on or about October 15th, 2020.  Ms. Martin has remained on disability / stress leave, at the instruction of her treating physician,  until March 23rd, 2021, when she returned to ExxonMobil.

48.     Upon Ms. Martin's return, she was immediately placed back on her erroneous Performance Improvement Plan, and tasked with duties and responsibilities for which she had no qualifications or prior experience.  As of the date of this instrument, Ms. Absher (Ms. Martin's former manager) has been replaced by Ms. Hasberry – Ms. Absher's prior direct manager.  On information and belief, Ms. Absher herself was relocated to Midland, Texas for reasons unknown.  This new manager  intimated to Ms. Martin that she spoke with various entities within both ExxonMobil Human Resources and the ExxonMobil Legal Department in order to ascertain how to handle Ms. Martin's return to work and continuation of her erroneous PIP.

## V.  CAUSES OF ACTION

### A.      RACIAL DISCRIMINATION BY EXXONMOBIL UNDER 42 U.S.C.§ 1981

49.     Plaintiff hereby adopts all factual allegations above *in haec verba*.

50.     **§1981 STATUTE OF LIMITATIONS**.  Pursuant to 28 U.S. Code §1658(a); Except as otherwise provided by law, a civil action arising under an Act of Congress enacted after the date of the enactment of this section may not be commenced later than 4 years after the cause of action accrues.

51.    Section 1981 prohibits race discrimination & retaliation, which includes African Americans within that ambit.  For purposes of Section 1981, African American is a "race".  *See Jatoi v. Hurst-Euless Bedford Hosp. Authority*, 807 F.2d 1214, 1218 (5th Cir. 1987); *Banker v. Time Chem., Inc.*, 579 F. Supp. 1183, 1186 (N.D. Ill. 1983).

52.    In the absence of direct evidence of discrimination, Section 1981 cases are governed by the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007); *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 403 n.2 (5th Cir. 1999) (noting that Section 1981 claims and Title VII claims use the same burdens of proof and analysis).

53.    First, the plaintiff must establish a *prima facie* case of discrimination, "which requires a showing that the plaintiff (1) is a member of a protected group; (2) was qualified for the position at issue; (3) was discharged or suffered some adverse employment action by the employer; and (4) was replaced by someone outside his protected group or was treated less favorably than other similarly situated employees outside the protected group." *McCoy*, 492 F.3d at 556; *Caldwell v. Univ. of Houston Sys.*, 520 Fed. Appx. 289, 293 (5th Cir. 2013); *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 425 (5th Cir. 2000).

54.    If the plaintiff makes a *prima facie* showing of discrimination, the employer must then provide a legitimate, non-discriminatory reason for the employment action. *Byers*, 209 F.3d at 425. "The burden on the employer at this stage is one of production, not persuasion; it can involve no credibility assessment." *Alvarado v. Tex. Rangers*, 492 F.3d 605, 611 (5th Cir. 2007) (quotations and citations omitted).

55.   In the absence of direct evidence of discrimination, Section 1981 cases are governed by the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007); *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 403 n.2 (5th Cir. 1999) (noting that Section 1981 claims and Title VII claims use the same burdens of proof  and analysis.)

## B.   RACIAL DISCRIMINATION BY EXXONMOBIL UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 42 U.S.C.§ 2000e, *et seq*

56.   Plaintiff hereby adopts all factual allegations above *in haec verba*.

57.   A claim of intentional discrimination may be proved by either direct  or circumstantial evidence. See *Wallace v. Methodist Hosp. Sys*. 271 F.3d 212, 219 (5th Cir. 2001).  In cases of circumstantial evidence, courts usually follow the burden shifting analysis articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), for indirect discrimination claims. See *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007); *Wheeler v. BL Dev. Corp.*, 415 F.3d 399, 405 (5th Cir. 2005).

58.   To establish a *prima facie* case of discrimination, a plaintiff must establish he: (1) is a member of a protected class; (2) was qualified for the position at issue; (3) was subjected to an adverse employment action; and (4) was replaced by someone outside the protected class, or other similarly situated persons were treated more favorably.  *McCoy*, 492 F.3d at 556; *Okoye v. Univ. of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 512-13 (5th Cir. 2001).

59.     In the instant case, Plaintiff is prepared to show that she (1) is a member of the class (Hispanic/Latina) who is intended to be protected by the statute; (2) was qualified for the position at issue, an irrefutable fact as she was vetted and hired by the Defendant and performed well enough to receive discretionary bonus / pay increase / promotion; (3) was subject to adverse employment action(s) ; and (4) other similarly situated persons (her African-American counter part) were treated more favorably. *Id*.

### C.     RACIAL DISCRIMINATION UNDER CHAPTER 21 OF THE TEXAS LABOR CODE (TCHRA)

60.     Plaintiff hereby adopts all factual allegations above *in haec verba*.

61.     Plaintiff brings suit against Defendant for damages sustained as a result of their discrimination in wilful violation of the Texas Commission on Human Rights Act **§**21.000 *et seq* of the Texas Labor Code (the "Act").

62.     Under §21.051 of the Texas Commission on Human Rights Act (codified within §21.000 *et seq* of the Texas Labor Code): An employer commits an unlawful employment practice if because of ...*race*, the employer: (1)... discharges an individual, or discriminates in any other manner against an individual in connection with compensation or the terms, conditions, or privileges of employment;  or (2) limits, segregates, or classifies an employee ... in a manner that would deprive or tend to deprive an individual of any employment opportunity or adversely affect in any other manner the status of an employee. *Id*.

63.     Pursuant *Ysleta ISDA v. Monarrez*, 177 S.W.3d 915, 917 (Tex. 2005). "To prevail on a claim of racial discrimination, the plaintiffs had to prove that (1) they were members of a class protected by the act, (2) they were qualified for their positions, (3) they were terminated, and (4) they were treated less favorably than similarly situated members of the opposing class. *Id*.

64.     In this case, Plaintiff (1) as an Hispanic / Latina, belongs to a protected class, (2) was qualified for her position, (3) was demoted / placed on an erroneous performance improvement plan, and (4) the plaintiff was treated less favorably than a similarly situated African-American counter part. *Id.*

65.     Under §21.125 of the Texas Commission on Human Rights Act (codified within §21.000 *et seq* of the Texas Labor Code): Except as otherwise provided by this chapter, an unlawful employment practice is established when the complainant demonstrates that race, color, sex, national origin, religion, age, or disability was a mere *motivating factor* for an employment practice, even if other factors also motivated the practice, unless race, color, sex, national origin, religion, age, or disability is combined with objective job-related factors to attain diversity in the employer's work force. *(Emphasis added) Id*.

### D.   RETALIATION[5] UNDER, 42U.S.C. 1981, UNDER 42 U.S.C. 2000e & UNDER CHAPTER 21 OF THE TEXAS LABOR CODE

66.   Plaintiff hereby adopts all factual allegations above *in haec verba.*

67.   A complaint of racial discrimination was submitted to ExxonMobil on or about August 14th, 2020.   An initial demand and complaint of discrimination was submitted to ExxonMobil's management staff, including Suzzanne McCarron, VP of Public & Government Affairs; Tracy Gunnlaugsson, VP of Human Resources; Stefan Jander, Business HR Manager; Jason Branch, Senior Executive S&D Manager; and, Melanie Clifton, Upstream Manager.

68.   Despite receiving these complaints of discrimination, transmitted through Ms. Martin's counsel of record, ExxonMobil refused to engage in any ameliorative efforts to address Ms. Martin's complaints and concerns.   In direct response to this complaint, Ms. Martin was placed on an arbitrary and erroneous  Performance Improvement Plan.

69.   Specifically, Plaintiff would reference the temporal proximity of the sequential submission of her complaint of racial discrimination to her managers and supervisors, and her arbitrary placement on a so-called Performance Improvement Plan within one week of submitting said complaints. [6]

---

[5] As of May 27th, 2008, the United States Supreme Court delivered its decision in *CBOS West, Inc.* v. *Humphries*, NO 06-1431 (May 27, 2008)(slip op.)., holding that Section 1981 of the Civil Rights Act of 1866 unequivocally includes claims for underline retaliation by those pursuing race and color claims under the Statute.

[6] The amount of **time** between an employee's protected activity and the adverse employment action is "part of the analysis" with respect to whether an employee can establish the necessary causal connection. *Gee*, 289 F.3d 346 n.3 (quoting *Shirley* v. *Chrysler First, Inc.*, 970 F.2d 39, 44 (5th Cir. 1992)).   Timing can be a relevant factor in determining whether a causal connection exists where the timing is "suspiciously proximate." *Fabela*, 329 F.3d 417 n.9.

70.     Plaintiff restates and reiterates her prior contention that 1981 claims and Title VII claims are examined under the same lenses pursuant to *Shackleford*, and as such, would assert that a cause for retaliation under 1981 falls under the same burdens as a cause for retaliation under Title VII.  Hence, no alteration should be required in its prosecution. *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 403 n.2 (5th Cir. 1999) (noting that Section 1981 claims and Title VII claims use the same burdens of proof and analysis.)

71.     Plaintiff would seek to bring this charge of Retaliation against her managers individually, as they acted directly in bringing about the intentional infringement of her rights which were protected under 42 U.S.C. §1981. [7]

72.     To successfully bring a claim of retaliation, the complainant must generally establish  that 1) he or she **engaged** in activity protected by the statute; 2) that the employer took an **adverse employment action** against him or her; and 3) a **causal connection** exists between the protected activity  and  the  adverse  employment  action. (Emphasis added) *Gee* v. *Principi*, 289 F.3d 342, 345 (5th Cir. 2002)(Title VII); *Davis* v. *Dallas Area Rapid Transit*, 383 F.3d 309 (5thCir.  2004)(retaliation  under  42  U.S.C.  §1981); *Hernandez* v. *Crawford Building Material Co.*, 321 F.3d 528 (5th Cir. 2003)(ADEA); 42 U.S.C. §12203(a), (b) (Americans with Disabilities Act).

---

[7] See *Cardenas v. Massey*,  269 F.3d 251, 268 (3d Cir. 2001); *Al-Khazraji  v.  Saint Francis  College*, 784  F.2d 505, 518  (3d  Cir.  1986)

73.   **ENGAGEMENT**.  The Fifth Circuit defines protected activity as "opposition to any practice rendered unlawful by Title VII, including making a charge, testifying, assisting or participating in any investigation, proceeding or hearing under Title VII." *Ackel* v. *Nat'l Communs., Inc*., 339 F.2d 376, 385 (5thCir. 2003).  More simply, "Title VII prohibits an employer from retaliating against an employee because that employee has complained about acts of discrimination at work." *Manning* v. *Chevron Chem. Co.,LLC*, 332 F.3d 874 (5th Cir. 2003).

74.   To that end, the Plaintiff did submit a complaint to ExxonMobil through her counsel of record *prior* to her placement on an erroneous Performance Improvement Plan.  The Plaintiff was clearly given the ultimatum to adhere and complete this so-called performance improvement plan, or face arbitrary termination.

75.   Moreover, a plaintiff is not required to establish an actual violation of Title VII (or 1981) to invoke the protections of the anti-retaliation provisions. Rather, a plaintiff only needs show that a charge was made, *a complaint was submitted*, or that participation in investigation of a claim occurred. *Green* v. *Administrators of Tulane Educational Fund*, 284 F.3d 642, 657 (5th Cir. 2002).   (A plaintiff's reasonable belief that she was in the process of being terminated because of her gender and made a complaint is sufficient for a retaliation claim.) *Id.*

76.   To that end, Plaintiff would site her complaint, submitted in writing, and verbal interactions with several Managers, including Ms. Absher, to display her qualification in engaging within the employer.

77.   **ADVERSE ACTION**. Although the Fifth Circuit generally applies Title VII holdings to claims brought under §1981, the definition of adverse employment decision is broader under §1981. Under §1981, reprimands, disciplinary filings and transfers that are "equivalent to demotions" may be considered adverse employment actions. *Banks*, 320 F.3d at 580; *Erves*, 2004 WL 904122. Plaintiff would allege that her placement on an erroneous & unsubstantiated PIP qualified as an "adverse action".

78.   **CAUSAL CONNECTION**. The final element of a plaintiff's prima facie case requires a plaintiff to establish a causal connection between his or her protected activity and the adverse employment action suffered. This causal link "need not rise to the level of a 'but for' standard.'" *Gee*, 289 F.3d at 345 (quoting *Raggs* v. *Miss. Power & Light Co.*, 278 F.3d 463, 471 (5th Cir. 2002)). Nor does a plaintiff need to prove that "her protected activity was the sole factor motivating the employer's challenged decision in order to establish the 'causal link' element of a *prima facie* case." *Id.* (quoting Long v. *Eastfield Coll.*, 88 F.3d 300, 305 n.4 (5th Cir. 1996)). In fact, the causal link element is "much less stringent" than the "but for" causation standard to be presented to a jury for determination. *Banks-Jones* v. *Hilton Reservations Worldwide, LLC*, 2004 WL 190266 (N.D. Tex. 2004)(quoting *Montemayor* v. *City of San Antonio*, 276 F.3d 687, 692 (5th Cir. 2001)).

79.   In the instant case, the Plaintiff complained on or about August 15th, 2020. After several days, she was then placed on a Performance Improvement Plan without her agreement or consent. Plaintiff contends that causal connection is created by her initiation and engagement

in the complaint process regarding racist behavior through her demand letter.  Further, Plaintiff would reinforce that contention by extreme temporal proximity between her formal complaint through counsel, and her placement on the PIP.

80.   Finally, in the more usual case of circumstantial evidence, the burden of production, not proof, shifts to the employer upon plaintiff's establishment of his or her prima facie case. See gen. *Davis*, 383 F.3d at 320.  However, Fifth Circuit case analysis overwhelmingly deals with whether the plaintiff has demonstrated that the employer's articulated reason is a pretext for retaliatory motive.  See *Aldrup* v. *Caldera*, 274 F.3d 282, 286 (5thCir. 1996). To this end, the Plaintiff would resolve that her placement on the performance improvement plan was, in fact, in almost immediate retaliation by her supervisors for complaining of racial discrimination.

## VI.  INFERENCE OF PRETEXT

81.   Where, as here, the plaintiff makes out a *prima facie* case of discrimination, and retaliation, the defendant must articulate a legitimate non-discriminatory reason for the adverse employment decision.  *See Baker,* 430 F.3d at 754-55.  After the employer does so, "any presumption of [discrimination] drops from the case" and the burden shifts back to the employee to establish that the employer's "stated reason is actually a pretext for [discrimination]."  *Baker*, 430 F.3d at 755 (quoting *Septimus*, 399 F.3d at 610-11).

82.   The factual allegations incorporated above, combined with the following arguments which clearly display the racial biased applied to Ms. Martin, all serve as an indicator that any legitimate non-discriminatory reason for termination, is in fact nothing more than pretext.

83.   An employer's failure to follow its own policies or normal practices may be evidence of pretext.  For example, when an employer has a disciplinary system that involves warnings, failure to follow that system may give rise to inferences of pretext. *Goudeau* v. *Nat'l Oilwell Varco, L.P.*, 793 F.3d 470, 477 (5th Cir. 2015).

84.   By and through the above arguments, Plaintiff's claims shall survive summary judgment.[8]

## VII.   DAMAGES

85.   The damages under Section 1981 consist of back-pay, front-pay (or reinstatement), compensatory damages, punitive damages, attorney's fees, and costs.  Each component is explained below.  There is no cap, as there are with Title VII claims.

86.   **BACK PAY**.  Prevailing claimants under the anti-discrimination laws may recover lost back-pay and benefits.  *See Miller v. Raytheon Co.*, 716 F.3d 138, 146 (5th Cir. 2013).  The purpose of back pay is to "make whole the injured party by placing that individual in the position he or she would have been in but for the discrimination." *Sellers v. Delgado Cmty. Coll.*, 839 F.2d 1132, 1136 (5th Cir. 1988).

---

[8] *See, e.g., Haire v. Board of Sup'rs of La. State Univ. Agricultural & Mech. Coll.*, 719 F.3d 356, 365 n. 10 (5th Cir. 2013) (reversing summary judgment for the employer in a discrimination case, and holding that, "[e]vidence demonstrating that the employer's explanation is false or unworthy of credence . . . is likely to support an inference of discrimination *even without further evidence of defendant's true motive*.") (italics in original)

87.   **FRONT PAY**.  "Front pay refers to future lost earnings."  *Wal-Mart Stores v. Davis*, 979 S.W.2d 30, 45 (Tex. App.–Austin 1998, pet. denied).  Regarding the calculation of front-pay, the Fifth Circuit has stated that  "[f]ront pay is . . . calculated from the date of judgment to age 70, or the normal retirement age, and should reflect earnings in mitigation of damages." *Patterson*, 90 F.3d at 936 n. 8 (citing J. Hardin Marion, Legal and Equitable Remedies Under the Age Discrimination in Employment Act, 45 MD.L.REV. 298, 330–334 (1986)).  *See also Blum v. Witco Chem. Corp.*, 829 F.2d 367, 374 (3d Cir. 1987) ("In calculating a front pay award, the jury must consider the expected future damages caused by defendant's wrongful conduct from the date of judgment to retirement.").

88.   **COMPENSATORY DAMAGES**.  Ms. Martin has suffered future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses, for which she seeks recovery in this lawsuit under Section 1981 and Title VII.  *See, e.g.*, *Salinas v. O'Neill*, 286 F.3d 827, 833 (5th Cir. 2002) (affirming $150,000.00 compensatory damages award under Section 1981 where the plaintiff did not receive a position because of her race); 42 U.S.C. § 1981A(a)(1) (providing for compensatory damages for such harms under Title VII).

89.   **PUNITIVE DAMAGES**.  ExxonMobil acted with malice and reckless indifference to Ms. Martin federally protected civil rights, thus justifying awards of punitive damages under Section 1981 and Title VII.  *See, e.g.*, *Abner v. Kansas City Southern Railroad Co.*, 513 F.3d 154, 164 (5th Cir. 2008) (affirming $125,000.00 punitive damages awards to each plaintiff under Section 1981, even though each plaintiff was awarded only $1.00 in actual damages,

and strongly suggesting that any punitive damages award up to $300,000.00 per plaintiff would have been appropriate even in the absence of any actual damages); *Hampton v. Dillard Dept. Stores*, 18 F. Supp. 2d 1256 (D. Kan. 1998) (awarding the plaintiff $1,100,000 in punitive damages in a Section 1981 race discrimination case); 42 U.S.C. § 1981A(a)(1) (providing for punitive damages under Title VII when the discrimination is shown to be with "malice or reckless indifference"). In *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 119 S. Ct. 2118 (1999) the U.S. Supreme Court, interpreting Title VII, held that to satisfy the "malice or reckless indifference" requirement, the plaintiff does not have to prove that the violation was egregious or outrageous.  *Id*. at 535-36.

90.   Rather, all that is required is proof that the employer knew that is was acting in the face of a perceived risk that its actions were in violations of the law's prohibition against discrimination.  *Id*.; *see also Schexnayder v. Bonfiglio*, 167 Fed. Appx. 364, 368 (5th Cir. 2006) ("a jury may award punitive damages pursuant to Title VII merely if the employer knew it *may have been* violating the law.") (italics in original).  Finally, unlike Title VII claims, there is **no cap** on the amount of *compensatory* **or** *punitive damages* a successful plaintiff can recover for claims filed under Section 1981.

## VIII.  JURY DEMAND

91.   Ms. Martin demands a trial by jury.

## IX. PRAYER

92.     Ms. Martin asks that she be awarded a judgment against ExxonMobil for the following:

a.      Actual damages including but not limited to pecuniary losses, non-pecuniary losses, Back-Pay, Front Pay, Compensatory Damages, and, Punitive Damages; in the sum of **$300,000.00**; and,

b.      Prejudgment and post-judgment interest;

c.      Attorney's fees and court costs; and,

d.      All other relief to which Plaintiff is entitled.


                                          Respectfully Submitted,


                                          _/s/Julian Frachtman_
                                          H. Julian Frachtman
                                          SDTX: 2695031
                                          SBN:   24087536
                                          tel: 832.499.0611
                                          fax: 713.651.0819
                                          Hfrachtmanlaw@gmail.com
                                          3100 Richmond, Ste 203
                                          Houston, Texas 77098

                                          ATTORNEY FOR PLAINTIFF